# United States Court of Appeals
## For the First Circuit

No. 20-1035

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE L. RODRÍGUEZ-SANTOS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Gelpí, Lipez, and Thompson,
Circuit Judges.

Jose R. Gaztambide-Añeses for appellant.
Jonathan L. Gottfried, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, and Robert P. Coleman III, Assistant United States
Attorney, were on brief, for appellee.

December 29, 2022

**LIPEZ**, <u>Circuit Judge</u>.    Jorge Rodríguez-Santos was convicted of aiding and abetting (1) a carjacking resulting in death (Count One), (2) kidnapping resulting in death (Count Two), and (3) the use of a gun during a crime of violence resulting in murder (Count Three).  He appeals his conviction, arguing that the evidence was insufficient on all counts and that the district court erred by failing to provide a duress instruction to the jury.  He also contends that his conviction for aiding and abetting the use of a gun during a crime of violence must be vacated in light of the Supreme Court's decision in <u>United States</u> v. <u>Davis</u>, 139 S. Ct. 2319 (2019).  Finally, he challenges two aspects of his sentence. We affirm.

## I.

Because this appeal concerns, in large part, a sufficiency of the evidence challenge, "we recount the facts in the light most favorable to the verdict."  <u>United States</u> v. <u>Paz-Alvarez</u>, 799 F.3d 12, 18 (1st Cir. 2015).  They are shocking.

At approximately 5:00 PM on October 10, 2015, Maria Luisa Mayol-Rivera, driving a white Mitsubishi Lancer, pulled up outside the home of Melissa Cartagena-Vives and Ricardo Pagan-Rodríguez in Ponce, Puerto Rico.  Cartagena-Vives and Pagan-Rodriguez were working on a car when Mayol-Rivera arrived.  When she approached the car, Cartagena-Vives saw that Mayol-Rivera was upset, her mouth was split, her face was covered in blood, and she was drunk.

- 2 -

Seeing Mayol-Rivera's distress, Cartagena-Vives offered to call the police, but Mayol-Rivera declined. Instead, as Cartagena-Vives described, Mayol-Rivera requested "help to catch the guys [who had] taken her phone from her and . . . beat her up." Enidza Marie Rodriguez-Figueroa, another witness who had been outside with Cartagena-Vives, testified that Mayol-Rivera was scared and had stated that the "guys" -- presumably those who had beaten her -- "were going to burn her inside the vehicle."

After attempting to aid Mayol-Rivera for several minutes, Cartagena-Vives received a call on her cell phone. She recognized the voice of Luis Miguel Jiminez-Medina ("Luis Miguel"), whom she also saw standing on a nearby hill, holding a weapon.[1] Luis Miguel threatened her and warned her to get Mayol-Rivera out of the area because she was a federal agent. After Cartagena-Vives hung up, she saw him fire a single shot -- at what target is unclear -- before leaving the hill.

Not long after, a blue Dodge truck arrived outside of Cartagena-Vives's home carrying three men: Luis Miguel, Tito Bodon, and Rodríguez-Santos, the defendant. Bodon was driving, Rodríguez-Santos was in the front passenger seat, and Luis Miguel was seated in the back. Rodríguez-Santos ordered Luis Miguel to

---

[1] It is unclear from the record how Cartagena-Vives recognized Luis Miguel's voice and, in general, whether the witnesses at Cartagena-Vives's house had any prior relationship with Mayol-Rivera or her abductors.

"[g]et out and move" when they arrived. Luis Miguel and Rodríguez-Santos then got out of the truck. Mayol-Rivera started screaming that these were the men who had beaten her and threw a bottle of liquor at their truck. Rodríguez-Santos approached Mayol-Rivera, who was standing by her car, grabbed her, and dragged her toward her car by her hair, pulling so hard that he "moved her face back." He then hit her, slammed her face against her car mirror, and ordered her to get in the car. She was screaming at him to let go of her. He then gave her to Luis Miguel, urging him to "move it" and get into the backseat with Mayol-Rivera. Luis Miguel then also hit her, "grabbed hold of her[,] and put her inside her car in the back." After getting Mayol-Rivera into the back seat, Luis Miguel got into her car with a tank of gasoline. Both vehicles then left the scene -- Rodríguez-Santos drove Mayol-Rivera's car away, with Luis Miguel and Mayol-Rivera in the back seat.

That evening, at approximately 10:00 PM, the Puerto Rico Police Department received an anonymous call reporting a person and a vehicle on fire in Rio Chiquito. A homicide investigator went to the scene and discovered a burned Mitsubishi Lancer and, across the road, a burned body. From the vehicle's license plate number, the police were able to trace the car to Adriana Pou-Porrata. Pou-Porrata explained that she had lent the car to Mayol-Rivera, who had been staying at her house. A forensic dental

examination later confirmed that the body found on the side of the road was Mayol-Rivera.

Investigators found gasoline on Mayol-Rivera's clothing, five 9mm bullet casings under her body, and nine .40-caliber bullet casings in an area nearby. The autopsy confirmed that Mayol-Rivera died as the result of three gunshots to the head, which occurred before her body was burned. She also appeared to have sustained a gunshot to her left arm, and also exhibited first, second, third, and fourth-degree burns covering her entire body.

The morning after Mayol-Rivera's murder, Rodríguez-Santos dropped off his truck with a local mechanic, Antonio Rosado-Colón. He asked Rosado-Colón to fix a hole in the door of his truck and told him the hole had been caused by rebar, a steel rod. Rodríguez-Santos returned that afternoon to pay for the repairs and pick up the truck.

The police subsequently used security camera footage and Google maps to trace the route of Mayol-Rivera's car, the Mitsubishi Lancer, to the crime scene. They identified a blue Dodge truck driving with the Lancer to the scene and traced the truck to Rodríguez-Santos. Security footage also showed the blue Dodge truck returning along the same road twenty minutes later, without the Lancer. Investigators went to Rodríguez-Santos's home, where he allowed them to take his truck for analysis. That

analysis revealed a perforation caused by a bullet in one of the door panels.

A federal grand jury indicted Rodríguez-Santos on three counts: aiding and abetting a carjacking resulting in death, 18 U.S.C. § 2119, aiding and abetting a kidnapping resulting in death, 18 U.S.C. § 1201(a)(1), and aiding and abetting the use of a firearm during a crime of violence resulting in murder, 18 U.S.C. § 924(c)(1)(a), (j)(1).

At the five-day trial, Rodríguez-Santos testified that he participated in the events leading to Mayol-Rivera's murder only under duress. Specifically, he offered the following account. On the evening of October 10th, he was getting into his truck in the La Coqui ward after buying a drink when he was accosted by Tito Bodon and a masked man (whom he later identified as Luis Miguel). The men took control of Rodríguez-Santos's truck at gunpoint. A third man, identified only as "Chewi," approached the truck and entered on the passenger side. The three men then put a bag over Rodríguez-Santos's head and drove away with his truck, with him as a passenger.

When the truck eventually stopped, Luis Miguel got out, grabbed Mayol-Rivera, and put her in a car (ostensibly her Mitsubishi Lancer). Both vehicles then drove away but stopped again when Chewi got out to retrieve a red gas tank from a different vehicle before they continued on. Finally, the vehicles stopped

and Bodon ordered Rodríguez-Santos to get out and kneel on the truck's running board. Rodríguez-Santos saw the men pour gasoline over the white car and set it on fire. Bodon shot Mayol-Rivera, and Chewi poured gasoline on her body. However, the men decided not to kill Rodríguez-Santos. Instead, they drove him back to the La Coqui ward in his truck. Before getting out of his truck, the men told Rodríguez-Santos they would kill him if he ratted them out and also threatened his mother. The next morning, Bodon and Luis Miguel showed up outside Rodríguez-Santos's home and took him to get the bullet hole in his truck repaired.

The jury did not credit Rodríguez-Santos's story, and he was convicted on all counts. Defense counsel filed a Rule 29 motion, arguing that the evidence was insufficient on each count, which the district court denied. The district court then sentenced Rodríguez-Santos to concurrent terms of life imprisonment for the aiding and abetting in carjacking and kidnapping counts, and a life sentence for the firearm count, to be served consecutively to the other terms.[2] The district court also applied a sentencing enhancement for obstruction of justice because "Mr. Rodríguez deliberately gave false testimony during trial." This appeal followed.

_____

[2] The other men involved with this crime are either dead or imprisoned. Bodon died on September 18th, 2016, and Chewi has been dead since December 21st, 2017. Luis Miguel has been in custody since 2018.

## A. Sufficiency of the Evidence

Rodríguez-Santos argues that the evidence presented at trial was insufficient to warrant a conviction on any count. Because his appeal follows a guilty verdict, we "assess preserved sufficiency claims de novo . . . reviewing the evidence, and making all inferences and credibility choices, in the government's favor -- reversing only if the defendant shows that no rational factfinder could have found him guilty." United States v. Rodríguez-Torres, 939 F.3d 16, 23 (1st Cir. 2019).

### 1. Carjacking

Count One charged Rodríguez-Santos with aiding and abetting a carjacking resulting in death in violation of 18 U.S.C. § 2119. The elements of this offense are the "(1) taking or attempted taking from the person or presence of another; (2) a motor vehicle transported, shipped, or received in interstate or foreign commerce; (3) through the use of force, violence, or by intimidation; (4) with the intent to cause death or serious bodily harm; (5) that results in death." United States v. Castro-Davis, 612 F.3d 53, 61 (1st Cir. 2010).

Rodríguez-Santos primarily focuses his argument on the intent element, arguing that the record does not support a finding that he had the intent to seriously injure or kill Mayol-Rivera when aiding the carjacking. As Rodríguez-Santos was charged with

aiding and abetting the offense, we must determine whether the evidence indicates he "possessed -- or knew that the principals possessed -- at least conditional intent to inflict death or bodily harm at the time he and [the principals] took the car." United States v. Evans-García, 322 F.3d 110, 114 (1st Cir. 2003). The Supreme Court has explained that conditional intent for purposes of the federal carjacking statute exists when "at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car." Holloway v. United States, 526 U.S. 1, 12 (1999). In other words, the government can prove conditional intent by showing that a defendant was willing to cause bodily harm or death to accomplish the carjacking, which can be proven, for example, simply by showing that violence or intimidation occurred during the commission of the carjacking. See id. at 6-7, 9-10. This is so because such actions show that the defendant possessed the intent to harm or kill at the precise moment the crime was committed. Id. at 6-7. There is ample evidence in the record to support such a finding.

First, according to Rodriguez-Figueroa, one of the witnesses, Mayol-Rivera stated that she was scared because, before arriving in front of Cartegena-Vives's house, she had been beaten and threatened that she would be burned inside her car. Later, when Rodríguez-Santos and Luis Miguel arrived on the scene,

Mayol-Rivera indicated that they were the men who had beaten her. Second, witnesses described seeing Rodríguez-Santos hit Mayol-Rivera, pull her by her hair toward her car, slam her face into the car mirror, and hand her over to Luis Miguel, all while she was screaming. Third, after Luis Miguel forced Mayol-Rivera into the back of her car, a witness described seeing him get into the car carrying a tank of gasoline before Rodríguez-Santos drove them away. Fourth, later that evening, Mayol-Rivera was found dead, having been shot several times before her body was burned.

We have found the requisite intent to inflict serious bodily harm or death in circumstances much less violent than these. For example, in United States v. Díaz-Rosado, 857 F.3d 116, 121-22 (1st Cir. 2017), we concluded that evidence demonstrating that the appellant struggled with the victim, "'push[ed] and shov[ed]' her," "thr[e]w [her] onto the cement sidewalk," and then began driving away with her car while the victim was attempting to get her grandchild out of a car seat, was sufficient to indicate that the appellant was willing to cause serious bodily harm in order to complete the carjacking. We have also held that, while death alone is not enough to satisfy the intent requirement, "[c]ommon sense . . . dictates that the final act, at the very least, evidences the intent." Castro-Davis, 612 F.3d at 63 n.13.

To state the obvious, the evidence here permitted "a rational jury to conclude beyond a reasonable doubt that

[Rodríguez-Santos and the other men were] willing to cause serious bodily harm in order to abscond with [Mayol-Rivera]'s car." Díaz-Rosado, 857 F.3d at 122. As we have described, several witnesses identified Rodríguez-Santos as a key participant in the violent scene that ended with Mayol-Rivera's car being driven away. These witnesses also identified Rodríguez-Santos as the driver. Moreover, the witness accounts of Mayol-Rivera's statements and behavior during the incident suggest that Rodríguez-Santos had participated in the violent beating she received before her arrival at Cartagena-Vives's home. Taken together, these facts are sufficient to permit the reasonable inference that Rodríguez-Santos possessed, or at the very least knew that the other men possessed, the intent to seriously injure or kill Mayol-Rivera during the commission of the carjacking.

Finally, although it is unclear from the briefing if Rodríguez-Santos challenges other elements of this count -- he broadly states that there is no evidence of "actus reus"[3] on any count -- we briefly note that the evidence also supports the remaining elements of the aiding and abetting in a carjacking offense. Given the witness descriptions of the initial encounter and the ultimate discovery of the burned car, it is evident that

---

[3] Actus reus is defined as the action or conduct which is a constituent element of a crime, as opposed to the mental state of the accused. See ACTUS REUS, Black's Law Dictionary (11th ed. 2019).

- 11 -

Rodríguez-Santos, Luis Miguel, and Bodon were successful in obtaining control of Mayol-Rivera's vehicle, satisfying the first prong. As to the second prong, the parties stipulated to the fact that the vehicle in question was shipped in interstate commerce. Regarding the third prong, the above facts demonstrate that Rodríguez-Santos used violent force in obtaining control of the vehicle. And the final prong is satisfied by Mayol-Rivera's murder immediately following the events described above. Viewing the record in the light most favorable to the verdict, we conclude that the evidence supports the conviction on Count One.

### 2. Kidnapping

Count Two charged Rodríguez-Santos with aiding and abetting a kidnapping resulting in death. The federal kidnapping statute, 18 U.S.C. § 1201, proscribes the actions of "any person who: 'unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person.'" United States v. Brown, 295 F.3d 152, 154-55 (1st Cir. 2002) (quoting 18 U.S.C. § 1201(a)). The statute also provides that "if the death of any person results, [the offender] shall be punished by death or life imprisonment." 18 U.S.C. § 1201(a). To prove this count, the government needed to show that the defendant willfully aided and abetted the kidnapping. See United States v. Simpson, 44 F.4th 1093, 1099 (8th Cir. 2022); United States v. Urciuoli, 513 F.3d 290, 299 (1st Cir. 2008)

(quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)) (explaining than an aider and abettor is one who "associate[s] himself with the venture[] [and] participate[s] in it" and who "seek[s] by his action to make it succeed."). However, the government did not need to prove that Rodríguez-Santos knew in advance that death would result from the kidnapping. See Simpson, 44 F.4th at 1099. Instead, the "death resulted" element only required the government to prove that the kidnapping caused the victim's death, but not that the individuals involved intended or knew that death would result. See id. (citing United States v. Barraza, 576 F.3d 798, 807 (8th Cir. 2009)). And "results," as used in this context, "means that the kidnapping is a but-for cause of the death." United States v. Ross, 969 F.3d 829, 838 (8th Cir. 2020), vacated in part, No. 18-2800, No. 18-2877, 2022 WL 4103064 (8th Cir. Sept. 7, 2022) (citing Burrage v. United States, 571 U.S. 204, 210-11 (2014)). In short, the government only needed to show that the defendant by his actions aided in the kidnapping that resulted in death. See Simpson, 44 F.4th at 1099.

Rodríguez-Santos argues that there is no evidence that he aided and abetted a kidnapping because the government failed to show that he intended to commit the kidnapping, that he had advance knowledge of it, or that he facilitated the commission of the offense. However, as we have noted, the record contains witness testimony describing Rodríguez-Santos's active participation in

- 13 -

Mayol-Rivera's kidnapping. See United States v. Campa, 679 F.2d 1006, 1010 (1st Cir. 1982) ("The government must prove some affirmative participation by the aider and abettor."). The jury heard testimony from witnesses who saw Rodríguez-Santos grab Mayol-Rivera and hit her before getting into her car and driving away, with her in the backseat. One witness described hearing Rodríguez-Santos urging Luis Miguel to "move it" and get into the backseat with a resisting Mayol-Rivera. The jury also heard that investigators were able to trace the path of Mayol-Rivera's and Rodríguez-Santos's vehicles to the crime scene where her body was found.

Such evidence permits a reasonable inference that Rodríguez-Santos was aware of the intended offense (the kidnapping of Mayol-Rivera) and intended to assist Luis Miguel and Bodon in carrying it out. See Rosemond v. United States, 572 U.S. 65, 78 n.9 (2014) ("In any criminal case, . . . the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission."). Simply put, viewing the record in the light most favorable to the verdict, the evidence indicates that Rodríguez-Santos, Luis Miguel, and Bodon threatened and beat Mayol-Rivera, followed her car to Cartagena-Vives's home in Rodríguez-Santos's truck, and then abducted her. Hence, we readily affirm Rodríguez-Santos's conviction on the kidnapping count.

### 3. Use of a Firearm in Relation to a Crime of Violence

Count Three charged Rodríguez-Santos with aiding and abetting the use of a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A), here Mayol-Rivera's murder, id. § 924(j)(1). Section 924(j)(1) incorporates 18 U.S.C. § 1111, which states that a murder "is the unlawful killing of a human being with malice aforethought" and that a murder committed in the course of a kidnapping or robbery is murder in the first degree. The indictment listed both the carjacking and the kidnapping counts as underlying crimes of violence to support Count Three.[4] The government's decision to list both counts as potential underlying crimes of violence meant that evidence presented to prove the use of a firearm was interwoven with the proof on the two prior counts.

On this final count, Rodríguez-Santos raises only one sufficiency challenge. He argues that, as the indictment did not charge him with premeditation as to Counts One or Two, Count Three necessarily fails. He appears to draw this argument from United States v. Catalán-Román, in which we described an indictment that charged defendants with aiding and abetting the use of a firearm in connection with a crime of violence "with premeditation." 585 F.3d 453, 474 (1st Cir. 2009). But Catalán-Román does not hold

---

[4] Rodríguez-Santos raises a challenge to the "crime of violence" prong of this count in a later portion of his briefing. We follow suit and address only his sufficiency of the evidence arguments here.

that premeditation is an essential element of a charge under 18 U.S.C. §§ 924(c)(1)(A) and (j)(1).  Rather, we explained that "18 U.S.C. § 1111 'was intended to adopt the felony murder rule, and for a stated felony the "malice" element is satisfied by the intent to commit the unlawful felony.'"  Id. (quoting United States v. Morales-Machuca, 546 F.3d 13, 22 (1st Cir. 2008)).  Thus, if there was sufficient evidence that Rodríguez-Santos intended to aid in the carjacking or the kidnapping, the "malice" element of Count Three is satisfied.  As we explained above, there is ample evidence that he intended to aid in both the kidnapping and the carjacking, so his sufficiency challenge to Count Three also fails.

## B.  Jury Instructions

Rodríguez-Santos argues that the district court erred when it did not provide a jury instruction on duress.  He admits in his brief that he "did not disclose that he was going to employ the duress defense during trial or move the district court for a ruling on this subject prior to trial."  On appeal, he has also failed to identify any instance in the record where he requested an instruction on the affirmative defense.  His failure to seek a duress instruction or to object to the given instructions renders this argument unpreserved and thus subject to the rigorous plain

- 16 -

error standard, which he cannot meet.[5] Teixeira v. Town of Coventry, 882 F.3d 13, 16 (1st Cir. 2018).

To show plain error, Rodríguez-Santos must demonstrate that the omission of a duress instruction was (1) "an error . . . (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Pennue, 770 F.3d 985, 989 (1st Cir. 2014) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). There was no clear or obvious error in omitting the duress jury instructions because there was no error at all in the absence of a duress instruction.

To establish a duress defense, a defendant must demonstrate that he "committed a crime as a result of: '(1) an immediate threat of serious bodily injury or death, (2) a well-grounded belief that the threat will be carried out, and (3) no

---

[5] Rodríguez-Santos points to three Fifth Circuit decisions that he contends show that the trial court was obligated to sua sponte give a duress instruction to the jury. See Appellant's Br. at 63 (citing United States v. Posado-Rios, 158 F.3d 832 (5th Cir. 1998); United States v. Dixon, 413 F.3d 520 (5th Cir. 2005); United States v. Willis, 38 F.3d 170 (5th Cir. 1994)). While all of these cases relate to duress jury instructions, none of them support his entitlement to a duress instruction because, in all three cases, the defendant either requested a duress instruction before the district court or challenged the district court's proposed instructions. See Posado-Rios, 158 F.3d at 873-75; Dixon, 413 F.3d at 525; Willis, 38 F.3d at 174-176.

- 17 -

reasonable opportunity to escape or otherwise to frustrate the threat.'" United States v. González-Pérez, 778 F.3d 3, 13 (1st Cir. 2015) (quoting United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996)). Rodríguez-Santos testified that he was forced at gun point to allow Bodon, Luis Miguel and Chewi to take his truck. The three men put a bag over his head and drove to Cartagena-Vives's home, where he was ordered out of the truck so the other men could get out, and then ordered back in. From the truck, he watched Luis Miguel grab Mayol-Rivera and force her into a car. Eventually both the truck (carrying Rodríguez-Santos) and a car (carrying Mayol-Rivera) left and drove to the murder scene. There, Rodríguez-Santos was ordered out of the truck and told to kneel on the running board. He saw the men kill Mayol-Rivera and set fire to her vehicle.

Such testimony fails to establish the elements of a duress defense because, rather than explaining that he participated in the charged crimes under threat, Rodríguez-Santos denies that he participated at all. By his account, he was the victim of a carjacking (of his own truck) and then was a mere bystander to the carjacking of Mayol-Rivera's vehicle, the kidnapping, and the use of a firearm to commit the murder. In his briefing, Rodríguez-Santos argues he was "forcefully pressure[d] to go along with the taking of the vehicle and the kidna[p]ping,"

but he describes no conduct that he was forced to engage in beyond simply being present at various crime scenes.

Because he failed to put forward any facts that could satisfy the elements of a duress defense, the district court could not have committed error in not giving the instruction even if it had been requested. In sum, Rodríguez-Santos's argument that the jury should have been instructed on the affirmative defense of duress clearly fails the plain error standard because there was no error at all.

## C. Crime of Violence

Rodríguez-Santos argues that his conviction for aiding and abetting the use of a firearm in connection with a crime of violence under 18 U.S.C. § 924(c) is invalid in light of United States v. Davis, 139 S. Ct. 2319 (2019). The term "crime of violence" as relevant to convictions under § 924(c) is defined as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (referred to as "the force clause") or that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (referred to as "the residual clause"). 18 U.S.C. § 924(c)(3)(A)-(B). In Davis, the Court held that this second definition, the residual clause, was unconstitutionally vague. Davis, 139 S. Ct. at 2336.

In his briefing, Rodríguez-Santos states that his conviction under § 924(c) rests on the residual clause definition of "crime of violence" and thus must be overturned. However, he does not explain why he believes only the residual clause definition applies to Counts One and Two and does not differentiate between the two possible predicate offenses described to the jury: carjacking and kidnapping. If the force clause applies to the predicate offenses, the unconstitutionality of the residual clause definition is irrelevant. See United States v. Hernández-Román, 981 F.3d 138, 146 (1st Cir. 2020) (noting that "any conceivable infirmity in the residual clause of [§ 924(c)] offered the defendant no avenue for relief when the predicate offense qualified as a crime of violence under one of the other clauses"). The question, then, is whether carjacking or kidnapping is a crime of violence within the meaning of the force clause.

We have previously held that the force clause encompasses federal carjacking. United States v. Cruz-Rivera, 904 F.3d 63, 66 (1st Cir. 2018). We have not considered whether the force clause applies to federal kidnapping under 18 U.S.C. § 1201(a). Other circuit courts have considered this question but have reached conflicting conclusions.[6] We need not

---

[6] The Fifth Circuit distinguishes between the crime of kidnapping and kidnapping resulting in death, holding that both are crimes of violence under the force clause. See In re Hall, 979 F.3d 339, 344 (5th Cir. 2020). Similarly, the Eighth Circuit

wade into this debate to resolve this case because, as we explain, Rodríguez-Santos's argument fails to meet two prongs of the rigorous plain error standard.

A situation where one predicate charge is a valid basis for a conviction and the other is not may give rise to a Yates error, which occurs where a jury is "instructed on alternative theories of guilt and may have relied on an invalid one."  Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam); see Yates v. United States, 354 U.S. 298, 311-12 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978); see also United States v. Laurent, 33 F.4th 63, 86 (2d Cir. 2022), cert. denied, No. 22-5754, 2022 WL 16542116 (Oct. 31, 2022) (finding a Yates error when the jury was improperly instructed to consider a predicate offense that did not constitute a crime of violence under

---

treats kidnapping resulting in death as a crime of violence under the force clause and implies that kidnapping should be as well because "kidnapping necessarily involves 'a deliberate decision to endanger another' that amounts to recklessness."  Ross, 969 F.3d at 839.  In contrast, the Seventh Circuit has held that "kidnapping is not a crime of violence under the Force Clause" because no element of the crime of kidnapping requires the use of physical force.  United States v. Jenkins, 849 F.3d 390, 393-94 (7th Cir. 2017), cert. granted, judgment vacated, 138 S. Ct. 1980 (2018).  Applying that same logic, the Eleventh Circuit has reasoned that "federal kidnapping . . . can be committed by mere inveiglement and holding the victim by either physical or psychological force."  United States v. Gillis, 938 F.3d 1181, 1210 (11th Cir. 2019) (emphasis in original).  Because physical force is not required to commit kidnapping, that court held that kidnapping is not a categorial crime of violence under the force clause.  Id.

- 21 -

§ 924(c)).  Such errors are typically subject to harmless error review.  <u>Skilling</u> v. <u>United States</u>, 561 U.S. 358, 414 (2010).

However, unpreserved claims are subject to the "more exacting plain error standard."  <u>Greer</u> v. <u>United States</u>, 141 S. Ct. 2090, 2099-100 (2021) (clarifying that plain error applies to unpreserved, non-structural constitutional errors); <u>Hernández-Román</u>, 981 F.3d at 145-46 (applying plain error to appellant's unpreserved claim that § 924(c)'s residual clause was unconstitutionally vague); <u>Laurent</u>, 33 F.4th at 86 (reasoning in a post-<u>Davis</u> decision that plain error review applied to appellant's unpreserved claim that the jury was improperly instructed to consider a predicate offense that did not constitute a crime of violence under § 924(c)).  Because Rodríguez-Santos did not raise an objection to the inclusion of both Counts One and Two as possible predicates in the jury instructions and on the verdict form, we review his claim for plain error.

The jury instructions in this case stated that a § 924(c) conviction could rest on either the carjacking count or the kidnapping count. Similarly, the indictment states that the predicate crime of violence underlying Count Three may be either Count One, carjacking resulting in death, or Count Two, kidnapping resulting in death.  The verdict also did not specify which predicate offense the jury ultimately relied upon in finding Rodríguez-Santos guilty on Count Three.  In other words, there is

a potential Yates error because it is impossible to know for certain whether the jury considered kidnapping or carjacking the predicate crime of violence required for a conviction on Count Three when only carjacking is an established crime of violence in this circuit. In theory, the jury could have concluded that Rodríguez-Santos only aided and abetted the use of a firearm in connection with kidnapping and not the carjacking.

This Yates error argument fails on the second prong of plain error review because the instructional error was not "clear or obvious." Hernández-Román, 981 F.3d at 146 (quoting Duarte, 246 F.3d at 60) (reciting the plain error standard). We have not determined whether kidnapping is a crime of violence; therefore, the district court did not commit a clear or obvious error in treating it as such, especially where, as here, other circuit courts have treated kidnapping as a crime of violence. In short, the district court's instruction reflected decisions of some of our sister circuits without conflicting with any of our own precedents and thus was not a clear or obvious error.

However, even if we assumed, solely for purposes of this decision, that the kidnapping charge was clearly an inappropriate predicate offense, the outcome would be no different because Rodríguez-Santos cannot establish that such an error "affected [his] substantial rights," the third prong of the plain error standard. Id.

"An error affects substantial rights if it was 'prejudicial,' meaning that the error 'must have affected the outcome of the district court proceedings.'" Ramirez-Burgos v. United States, 313 F.3d 23, 29 (1st Cir. 2002) (quoting United States v. Olano, 507 U.S. 725, 734 (1993)). This requirement "generally means that there must be a 'reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" Greer, 141 S. Ct. at 2096 (quoting Rosales-Mireles v. United States, 138 S. Ct. 1897, 1904-05 (2018)). Here, we conclude that the result would not have been different if the kidnapping charge had been omitted from Count Three because the kidnapping count and the carjacking count are "inextricably intertwined," Parker v. United States, 993 F.3d 1257, 1263 (11th Cir. 2021), and it is therefore improbable that the jury would have acquitted on Count Three in the absence of the kidnapping predicate.

The evidence used to prove both predicates was almost identical: essentially, Rodríguez-Santos and the other men simultaneously abducted Mayol-Rivera and took control of her vehicle before she was murdered. Further, all of the evidence regarding the use of a firearm was equally relevant to the "death resulting" element of the carjacking and the kidnapping. Therefore, it is highly unlikely that the jury would have reached

- 24 -

a different result on Count Three in the absence of the kidnapping predicate.

Moreover, of the two predicates, only the carjacking offense has an element requiring that a defendant commit the offense "through the use of force, violence, or by intimidation . . . with the intent to cause death or serious bodily harm." Castro-Davis, 612 F.3d at 61. Thus, if the jury were to consider the use of a gun in the context of only one predicate offense, it is likely that it would factor much more heavily into their decision on the carjacking.[7]

Accordingly, it would defy common sense to conclude that the jury could have found Rodríguez-Santos guilty of aiding and abetting the use of a firearm only with respect to the kidnapping and not the carjacking. See Foster v. United States, 996 F.3d 1100, 1107 (11th Cir. 2021), cert. denied, 142 S. Ct. 500 (2021) (concluding that the valid predicate offenses were "inextricably intertwined" with invalid predicates and that there was no possibility that the conviction rested only on invalid predicates); Stone v. United States, 37 F.4th 825, 832 (2d Cir.

---

[7] In closing argument, the government did not initially allude to the use of a firearm (or Mayol-Rivera's murder) in describing Rodríguez-Santos's intent to cause serious bodily harm to Mayol-Rivera during the carjacking. But, at a later point in its closing, the government stated, "[t]here is another kind of inference that you can make . . . which is, based on how the carjacking happened, it could be inferred that they were going to murder [Mayol-Rivera]."

2022), cert. denied, No. 22-5637, 2022 WL 16542129 (Oct. 31, 2022) (concluding that defendant was not prejudiced by a jury instruction including an invalid predicate offense because "the jury found facts 'satisfying the essential elements of guilt' on the valid predicate" (quoting Laurent, 33 F.4th at 86)); United States v. Angiulo, 897 F.2d 1169, 1200 (1st Cir. 1990) (concluding that "even though we have found that the accessory charge . . . [is] invalid as a predicate act, the nature of the charges and the evidence underlying those charges establishes that the jury necessarily must have found . . . two valid predicate RICO acts"); Durfee v. United States, No. 16-cv-280, 2020 WL 1942324, at *4 (D.N.H. Apr. 20, 2020) ("[W]hen the valid and invalid predicate offenses are coextensive, a reasonable probability does not exist that the jury convicted based only on the invalid offense."). There are simply no reasonable grounds for concluding that the jury could have convicted solely on the basis of a connection between the use of a firearm and the kidnapping predicate.

Therefore, we conclude that the inclusion of the potentially invalid predicate offense was not a plain or obvious error and that, even if it was error, it would be harmless without any effect on Rodríguez-Santos's substantial rights. Hence, Rodríguez-Santos has failed to satisfy the second and third prongs of the plain error standard.

**D. Sentencing**

Rodríguez-Santos challenges two aspects of his sentence. He argues that the district court erred when it failed to impose a downward departure based on duress and that the application of the obstruction of justice enhancement was unwarranted.

**1. Duress Departure**

Rodríguez-Santos contends that the district court should have granted him a downward departure per § 5K2.12 of the U.S. Sentencing Guidelines Manual ("Sentencing Guidelines"). That Sentencing Guidelines section contemplates a downward departure "[i]f the defendant committed the offense because of . . . duress, under circumstances not amounting to a complete defense." U.S.S.G. § 5K2.12 (U.S. Sent'g Comm'n 2004).

We review a district court's discretionary refusal to depart from the guideline range for reasonableness. See United States v. Herman, 848 F.3d 55, 58 (1st Cir. 2017). This approach accords with a deferential abuse of discretion standard and recognizes the "substantial discretion vested in a sentencing court." United States v. Flores-Machicote, 706 F 3.d 16, 20 (1st Cir. 2013). Here, Rodríguez-Santos offers no substantive challenges to the court's decision except to state that "there are sufficient out of the ordinary circumstances to warrant a downward departure." He does not, however, elaborate on these circumstances, or otherwise indicate how the court's decision was

unreasonable. Therefore, we consider this argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").[8]

However, even if this argument was not waived, we would affirm the district court's decision not to depart downward as reasonable. As noted above, there are no facts in this record that support a duress defense. See supra. Therefore, there is no way the district court could have concluded that Rodríguez-Santos mounted an almost complete duress defense as required by the downward departure he now seeks. Hence, the district court's decision not to depart downward from the guideline range was reasonable. See Herman, 848 F.3d at 58.

### 2. Obstruction of Justice Enhancement

Rodríguez-Santos argues that the district court's imposition of a two-point enhancement for obstruction of justice under § 3C1.1 of the Sentencing Guidelines was erroneous. Because Rodríguez-Santos objected to the obstruction of justice

---

[8] Although the transcript of the sentencing hearing contains no mention of a request for a downward departure, Rodríguez-Santos states that he preserved this argument and cites to a transcript from a status conference that occurred on March 8, 2019 (the sentencing hearing did not occur until December 2019). But whether this argument was preserved is irrelevant to our decision since Rodríguez-Santos failed to explain how the district court's decision not to depart was unreasonable.

enhancement below, we would ordinarily review the "sentencing court's decision for an abuse of discretion."  <u>United States</u> v. <u>Grullon</u>, 996 F.3d 21, 34 (1st Cir. 2021).

However, we choose not to address the substance of Rodríguez-Santos's arguments because even if the district court abused its discretion -- and we are not suggesting that it did -- Rodríguez-Santos was not harmed by the application of the enhancement, which did not alter his total offense level. Rodríguez-Santos quotes the district court's language in his own brief explaining that although the enhancement would increase his total offense level from 43 to 45, "Chapter 5 Part A commentary, Application Note 2 . . . establishes that in cases in which the total offense level is more than 43, the total offense level will be treated as an offense level of 43."  Hence, there is no basis for his claim that the obstruction enhancement affected his substantial rights by resulting in a longer sentence.

<u>Affirmed.</u>